**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN  DIVISION**

| | | |
|---|---|---|
| **GERALD L. RILEY, II,** | : | **CASE NO. 5:11-CV-1587** |
| | : | |
| **Plaintiff,** | : | **MAGISTRATE JUDGE** |
| | : | **VERNELIS K. ARMSTRONG** |
| **vs.** | : | |
| | : | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE,** | : | **AND ORDER** |
| | : | |
| **Defendant.** | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3)

of Defendant's final determination denying his claim for Period of Disability and Disability

Insurance Benefits (DIB) under Title II of the Act, 42 U. S. C. §§ 405 et seq and his claim for

Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  On

November 16, 2011, the parties to this action consented to have the undersigned Magistrate

adjudicate all further proceedings and enter judgment in this case pursuant to 28 U.S.C. § 636 (c)

and Fed.R.Civ.P. 73 (Docket No. 14).  Pending are the parties' briefs  on the Merits, and

Plaintiff's Reply  (Docket Nos. 16, 17 and 18).  For the reasons that follow, the Magistrate

Orders that the Commissioner's Decision be affirmed in part, reversed in part and remanded to

Commissioner for further proceedings consistent with this opinion.

**I.  Procedural Background**

Plaintiff, Gerald L. Riley, II, filed his current applications for Disability Insurance

Benefits (DIB) and Supplemental Security Income (SSI) on August 20, 2009, alleging disability

as of July 12, 2009  (Tr. 119-26, 135-60).[1]  Plaintiff alleged disability due to lower back pain,

open heart surgery, diabetes, methicillin-resistant staphylococcus aureus (MRSA), psoriatic

arthritis, high blood pressure, high triglycerides, and high cholesterol (Tr. 119-26, 140).

Plaintiff's claim was denied initially and upon reconsideration. (Tr. 78-81, 82-88, 97-110.)

On March 1, 2011,  Plaintiff's requested hearing took place in Akron, Ohio, before

Administrative Law Judge (ALJ) Lynn Ginsberg.  Plaintiff was represented by counsel.  Plaintiff

along with Vocational Expert (VE) Lynn Smith gave testimony.   (Tr. 26-77).  On March 23,

2011, the ALJ issued an unfavorable decision. (Tr. 7-25, Finding 11).  On July 18, 2011, the

Appeals Council denied Plaintiff's request for review of the ALJ's  decision, making the ALJ's

decision the final decision of the Commissioner (Tr. 1).  Thereafter, on August 2, 2011, Plaintiff

filed his Complaint with this Court seeking judicial review of the ALJ's decision  (Docket No.

1).

## II.  Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to

42 U.S.C. § 405(g) and  42 U.S.C. § 1383(c)(3).  McClanahan v. Commissioner of Social

Security, 474 F.3d 830, 832-33 (6th Cir. 2006).

## III.  Factual Background

### A.  Plaintiff's History

Plaintiff was born November 8, 1965. (Tr. 119.)  As of July 12, 2009, his alleged

---

[1]   All references to the transcript in this Report and Recommendation (i.e., Tr. #) refer to
Docket No. 12, with the "Tr." numbers in this Memorandum referring to the numbers located at
the lower right corner of the transcript pages.

disability onset date, Plaintiff was 43 years old.  He was 45 years old as of March 1, 2011, the

date of his administrative (Tr. 39, 147).  Plaintiff has a 12th-grade education. (Tr. 39, 147), and

has past relevant work of twenty years as a maintenance machinist. (Tr. 37-39, 69, 141-42,

153-54.)

### B.  Relevant Medical Evidence and Opinion

#### Physical Condition[2]

The following is a summary of the evidence of Plaintiff's medical history essentially

organized according to the conditions from which Plaintiff suffers: pancreatitis, cardiac, back,

and diabetes, hypertension and general medical.

**Pancreatitis**
● March 12-17, 2005, Plaintiff was hospitalized for pancreatitis at Twin City Hospital, with
follow-up March 19, 2005 (Tr. 723-34, 827-921).
● June 27-29, 2007, Plaintiff was admitted to Aultman Hospital for acute pancreatitis,
hyperglycemia, diabetes mellitus, severe hypertriglyceridemia, severe hypercholesterolemia,
hypertension, and tobacco abuse. (Tr. 248-59, 286-97, 438-51, 708-22).
● January 6 - 9, 2009, Plaintiff was admitted to Twin City Hospital for pancreatitis, secondary to
hypertriglyceridemia (Tr. 454),  hypertension, hypertriglyceridemia, and diabetes. (Tr. 397-403,
452-542, 586, 589-602, 667-74, 736-825, 1047-51.) While hospitalized, Plaintiff denied chest
pain, but his high blood pressure was uncontrolled and his medication was increased (Tr. 71-72).
Upon discharge, Plaintiff was prescribed medication and advised to follow a special low calorie,
low salt, low cholesterol diet  (Tr. 455).  Plaintiff was 5 feet, 8 inches tall and weighed 206
pounds  (Tr. 474).[3]
● May 17-19, 2009, Plaintiff experienced a flare-up of his pancreatitis after eating a hamburger
(Tr. 321).  Plaintiff was admitted to Union Hospital for acute pancreatitis, severe

---

[2]  Because Plaintiff is only challenging the ALJ's findings with respect to his alleged
physical impairments, the focus of this opinion is on the evidence relevant to those impairments.

[3]  In early January, 2009, Plaintiff's height and weight corresponded to a body-mass
index of greater than 31 and never dropped below this level throughout the relevant period.
National Institutes of Health, U.S. Department of Health and Human Services, body-mass index
calculator, found at http://www.nhlbisupport.com/bmi/ , last viewed by Plaintiff on January 9,
2012.

hypertriglyceridemia, stable atherosclerotic heart disease, type 2 diabetes mellitus, and hypertension. (Tr. 317, 319, 321, 323, 325, 327, 329, 331, 333-40, 347-74, 578-85).

●October 16, 2009, Plaintiff saw **Dr. Christian Olympia, M.D. - Primary Care Physician**, reporting that he was seeing **Dr. Mark Pellegrino, M.D., treating physician,** for back pain and blood testing showed high triglycerides and he indicated that he only missed his medication some days, and he was still having a lot of joint pain. (Tr. 938-39, 985, 1025-26.) Dr. Olympia diagnosed hyperlipidemia, unspecified; hypertension, uncontrolled, benign; back pain, low; and tobacco abuse. Id.

●December 14-17, 2009, Plaintiff was hospitalized at Twin City Hospital for acute pancreatitis with very high triglyceride levels and was treated there by Dr. Olympia. (Tr. 932-37, 958-84, 1018-22, 1057-74).

●September 25-29, 2010,  Plaintiff was not again treated for pancreatitis again until this date, almost a year later (Tr. 200), when he complained of severe abdominal pain after he ate chicken nuggets in non-compliance with his diabetic/low fat diet (Tr. 200-06). Plaintiff was admitted to Twin City Hospital for his sixth episode of acute pancreatitis, arising from his known history of "exceedingly high" hypertriglyceridemia. (Tr. 200-21, 1187-90).

**Dr. Jennifer Ney, D.O. - Treating Physician**

Dr. Ney did not recommend any surgical intervention (Tr. 208). Rather she treated Plaintiff  with bowel rest, intravenous fluids, and pain control measures (Tr. 207-08).

●September 29, 2010, Plaintiff was released from the hospital with instructions to follow a low fat diet and to stop smoking (Tr. 200).


**Cardiac**

●December 7-12, 2007, Plaintiff was admitted to Aultman Hospital for acute myocardial infarction and underwent coronary artery bypass graft by **Dr. Aqeel Sandhu, M.D, cardiothoracic surgeon**  (Tr. 234-47, 272-85, 383-89, 615-21).

●December 22-26, 2007, Plaintiff  was admitted to Aultman Hospital for an infection related to his bypass surgery. (Tr. 223-33, 261-71, 609, 611-14).

●January 15, 2008, Plaintiff followed up with Dr. Sandhu for wound care. (Tr. 382).

**Dr. Steven A. Malosky - M.D., Cardiologist**

●On March 25, 2008, Dr. Malosky cleared Plaintiff to return to work without restrictions (Tr. 304). Plaintiff denied any postoperative chest pain (Tr. 303).

**Dr. Christian Olympia, M.D. - Primary Care Physician**

●August 10, 2009, Plaintiff obtained from his Dr. Olympia for complaints of chest and back pain (Tr. 394). Chest x-rays were unremarkable for cardiac, hilar, and mediastinal structures  (Tr. 394). Dr. Olympia referred Plaintiff to his cardiologist, who told Plaintiff that his chest pain was non-cardiac in origin (Tr. 561).

●October 20, 2010, Plaintiff reported no chest pain despite not picking up his hypertension medication (Tr. 1184).

●December 2, 2010, **Dr. Amjad Iqbal, M.D., treating physician**, referred Plaintiff for myocardial perfusion scan and echocardiogram  (Tr. 1152-53).  Perfusion showed infarction without significant ischemia, and low-normal contractility with 52 percent ejection fraction. Id. Echocardiogram showed normal ejection fraction of 64 percent. Id.

●January 7, 2011, Plaintiff saw Dr. Iqbal, who reviewed Plaintiff's test results and reassured him

about his heart. (Tr. 1195).  Plaintiff reported evening palpitations. Id. Dr. Iqbal scheduled Plaintiff for a Holter monitor the following week. Id.

**Back**
●August 6, 2009, Plaintiff complained to Dr. Olympia that his chest was still bothering him, his back pain was worsening, and he was still unable to return to work because of the pain. (Tr. 562-63, 953-54). Dr. Olympia prescribed Vicodin and Flexeril, ordered lumbosacral x-ray and physical therapy, and ordered Plaintiff off work another two weeks. Id.
●August 20, 2009 Plaintiff complained to Dr. Olympia that his back pain was worsening (Tr. 564-65, 947-48).  He had started physical therapy (Tr. 653-58, 661-66, 992-97, 1000-04, 1035-40, 1043-46), but was unable to return to work, and weighed 206 pounds  (Tr. 564-65, 947-48).  Dr. Olympia noted Plaintiff's  back was tender to palpation, ordered him off work two more weeks, and referred him to a pain specialist. Id.
●August 28 and September 3, 2009 Plaintiff told Dr. Olympia his back pain continued to worsen, he still could not return to work, and he had scheduled an appointment with Dr. Pellegrino (Tr. 566-69, 943-46).   Plaintiff's back was still tender to palpation. Id.
**Rich Price - Physical Therapist**
Plaintiff attended his initial physical therapy evaluation appointment, but cancelled his remaining appointments (Tr. 664).
●September 11, 2009 (Tr. 664)m P.T. Price considered Plaintiff self-discharged as of this date.
●August and September of 2009, Plaintiff reported increased lower back pain (Tr. 562-63, 566-67, 943). Lumbosacral spine x-rays revealed mild mid lumbar spondylosis and thoracic x-rays showed mild to moderate thoracic spondylosis (Tr. 395-96).  Vertebral bodies were normal in height and alignment (Tr. 577).
●September 24, 2009, Plaintiff met with Dr. Pellegrino  (Tr. 628-32, 638-42, 1083-84). Plaintiff weighed 212 pounds. (Tr. 631, 641).  Dr. Pellegrino diagnosed presumed lumbar disc disease, worse on the left, with L5-S1 radiculopathy; associated bilateral, sacroiliac dysfunction, worse on the left; and residual, chronic right costochondritis and chest-wall neuralgia status post open-heart surgery. (Tr. 629-30, 638-39, 1083-84).
●October 5, 2009, MRI of Plaintiff's lumbar spine showed slight to mild central spinal canal and neural foraminal stenosis, ranging from slight to mild from L2 to S1(Tr. 1085). Additionally, it showed mild, diffuse spondylosis including mild facet joint arthropathy, at the L5-S1 level  (Tr. 940-41, 1023-24, 1085-86, 1091-92, 1101-02).  An EMG  study showed mild leg polyneuropathy, most likely due to diabetes, and superimposed left S1 radiculopathy (Tr. 1087). Dr. Olympia prescribed physical therapy (Tr. 655).
●October 13, 2009, Plaintiff returned to Dr. Pellegrino and underwent nerve conduction testing and electromyelogram. (Tr. 1087-90, 1106-07). Plaintiff's pain was primarily low back, radiating down the left lower extremity. (Tr. 1087, 1106).  Electrodiagnostic testing showed evidence of mild lower extremity polyneuropathy, most likely due to diabetes with distal demyelination especially, and superimposed left S1 radiculopathy. Id.   Dr. Pellegrino opined that Plaintiff's mild spinal degenerative changes, combined with his diabetes, were "enough to cause irritation primarily in the left S1 nerve root." (Tr. 1088, 1107).  Dr. Pellegrino ordered Plaintiff off work until the next follow-up in December. Id.
●November 11, 2009, **Dr. Charles V. Barrett, D.O, treating physician**, evaluated Plaintiff at

the Union Hospital Pain Management Center, pursuant to a referral from Dr. Sandhu for consultation (Tr. 1098-99, 1112-13).  Upon examination Plaintiff was found to be overweight, with a markedly flexed gait, increased lumbar pain with extension, and reproducible pain throughout the right pectoral muscle. (Tr. 1098, 1112).  Dr. Barrett diagnosed myofascial **chest** wall pain, left-sided lumbar radiculitis, lumbosacral spondylosis without myelopathy, and lumbar spinal stenosis. (Tr. 1099, 1113). Plaintiff presented with complaints of chest and back pain.  However, chest wall films showed no gross abnormalities (Tr. 1098). Dr. Barrett recommended a pain patch for the chest and facet injections for the lumbar spine   (Tr. 1099, 1113).

● December 15, 2009, Plaintiff denied any chest pain or shortness of breath (Tr. 968).

● January 7, 2010, Dr. Barrett administered lumbar facet injections  (Tr. 1100, 1111).

● January 12, 2010, Plaintiff followed up with Dr. Pellegrino  (Tr. 1082, 1105).  Despite recent facet injections, Plaintiff's back pain was getting worse. Id.  Examination revealed Plaintiff to be moderately uncomfortable, and that he transferred and ambulated slowly and deliberately because of pain and stiffness. Id. Dr. Pellegrino explained to Plaintiff how hyperlipidemia could increase his risk for pain problems and psoriatic arthritis. Id. He recommended Plaintiff follow up with a rheumatologist and to continue in pain management with injections. Id.

● January 21, 2010, Dr. Barrett administered another lumbar facet injection (Tr. 1110, 1130)

● June 23, 2010, Plaintiff underwent an MRI of the cervical spine, that showed degenerative osteochondrosis at C3-4 without critical central or neural foraminal stenosis, and was otherwise unremarkable (Tr. 1121).

● June 23, 2010, Cervical MRI showed degenerative osteochondrosis at C3-4 without critical stenosis. (Tr. 1121, 1129).

● July 7, 2010, Dr. Barrett administered a left SI joint injection with arthrogram on July 7, 2010. (Tr. 1118-20, 1127-28, 1176-78).

● August 5, 2010 Plaintiff reported to the Union Hospital Pain Management Center but saw **James Higginbotham, CNP, treating nurse practitioner** instead of Dr. Barrett, and he complained of increased pain since carrying his mother the night before. (Tr. 1125-26).  Mr. Higginbotham recommended a trial of cervical injections as well as Zanaflex for the thoracic pain. Id.

● November 10, 2010, Plaintiff returned to Dr. Barrett complaining of ongoing low-back pain. (Tr. 1159-66).  Plaintiff complained of constipation due to Vicodin and said he had not taken it for three days. Id.  Dr. Barrett noted that Plaintiff was overweight, had mild myofascial pain over his chest wall, which was improved, had mild discomfort with cervical and lumbar ranges of motion, and had significant SI pain with pelvic rock and tilt. Id. Dr. Barrett diagnosed improving myofascial chest wall pain, cervical and lumbosacral spondylosis, and bilateral sacroiliitis. Id. He recommended radiofrequency lesioning for more prolonged relief than had been provided by the injections. Id.

● December 3, 2010, Dr. Barrett conducted radiofrequency lesioning of the left and right SI joint with arthrogram to relieve pain of sarcoiditis  (Tr. 1155, 1157-58, 1172-73, 1175).

● January 4, 2011, Plaintiff denied any muscle weakness, joint stiffness, instability, or arthritis (Tr. 1181).

● January 7, 2011, Plaintiff also saw  Dr. Barrett who conducted radio frequency lesioning of the right SI joint with arthrogram. (Tr. 1155-56, 1168-69, 1171).

6

**Diabetes, Hypertension and General Medical**
- Plaintiff has insulin dependent diabetes mellitus type II (Tr. 558).
- June 2, 2009 Plaintiff complained to his treating physician, Dr. Olympia, of right-sided-chest and back pain. (Tr. 558-59). Dr. Olympia diagnosed chest pain, unspecified; diabetes mellitus type II, uncontrolled; back pain; and hypertension. Id. Dr. Olympia reported that Plaintiff's blood sugar levels were usually between 160 and 200, and he had no hypoglycemic episodes (Tr. 558).
- June 24, 2009 Plaintiff returned to Dr. Sandhu on referral from Dr. Olympia, with complaints of chest pain and joint pain. (Tr. 381). His blood-pressure medication was adjusted. Id.
- July 7, 2010, Dr. Olympia also saw Plaintiff for complaint of depression. (Tr. 1135-36).. Plaintiff stated that he was depressed because of his personal and medical problems. Id. He was not suicidal or homicidal. Id. Dr. Olympia prescribed Zoloft. Id.
- July 20, 2009, Plaintiff returned to Dr. Olympia again complaining of chest and back pain, stating that Dr. Sandhu had determined the pain was not cardiac. (Tr. 560-61). Dr. Olympia diagnosed chest pain, unspecified; diabetes mellitus type II, uncontrolled; back pain; hypertension, benign and controlled; and hyperlipidemia, unspecified. Id.
- August 6, 2009, Plaintiff underwent testing at Twin City Hospital. (Tr. 392-96). Plaintiff's hemoglobin A1C was 6.5. (Tr. 392, 1007). Chest x-ray showed no acute cardiopulmonary process but did show moderate first sternocostal osteoarthritis bilaterally and mild thoracic spondylosis. (Tr. 394, 575, 949, 1008). Lumbosacral x-ray showed mild mid-lumbar spondylosis. (Tr. 395, 577, 660, 951, 999, 1009, 1042). Thoracic x-ray showed mild to moderate thoracic spondylosis. (Tr. 396, 576, 659, 950, 998, 1010, 1041).[4]
- April 22, 2010, Plaintiff saw Dr. Olympia for medication refill, was diagnosed with hypertension, hyperlipidemia, diabetes, and low-back pain. (Tr. 1139-40).
- June 10, 2010, Dr. Olympia saw Plaintiff, noting that Plaintiff still had back pain, had obtained insurance, was compliant with his medications, and weighed 204 pounds. (Tr. 1137-38). His hemoglobin A1C was 10.6. (Tr. 1138). His diabetes remained uncontrolled, but his hypertension was controlled and benign (Tr. 1137-38).
- August 6, 2010, Plaintiff returned to Dr. Olympia stating that his depression had not improved on Zoloft. (Tr. 1133-34). He weighed 214 pounds. Id. Dr. Olympia increased Plaintiff's Zoloft. Id.
- September 21, 2010, Plaintiff saw Dr. Olympia for follow-up of his diabetes, psoriasis, hyperlipidemia, hypertension, and depression. (Tr. 1191-93).
- October 19, 2010, Dr. Olympia referred Plaintiff to Wooster Endocrinology, where he met with **Terri Weiland, PA-C**, for treatment for uncontrolled diabetes (Tr. 1145-50). Plaintiff's hemoglobin **A1C** was down to 8. Id. Plaintiff was taking all of his medications as prescribed but for metoprolol and Norvasc. Id. Plaintiff acknowledged that he had not been taking his diabetes or blood pressure medications as recommended (Tr. 1145). **Dr. Everett C. Burgess, Jr. M.D., treating physician** encouraged Plaintiff to comply with his treatment plan (Tr. 1150).
- October 20, 2010, Plaintiff followed up with Dr. Olympia (Tr. 1184-86). His diabetes and hypertension remained uncontrolled. Id. Dr. Olympia referred Plaintiff to cardiologist Amjad

---

[4]  Plaintiff had undergone a previous sternotomy. (Tr. 603-06).

Iqbal, M.D. for his coronary artery disease. Id.
●January 4, 2011, Plaintiff again saw Dr. Olympia and reported mood improvement on Zoloft, but his other conditions remained uncontrolled. (Tr. 1181-83).

**State Agency Reviewing Physicians**
●December 12, 2009, **W. Jerry McCloud, M.D., state non-examining physician** performed a physical residual functional capacity review  (Tr. 922-29), concluding that Plaintiff was capable of lifting or carrying twenty pounds occasionally and ten pounds frequently, of standing, sitting, and or walking six hours each in an eight-hour workday (Tr. 923), but no climbing ladders, ropes, or scaffolds, frequently balancing, occasionally climbing ramps and stairs, occasionally stooping, kneeling, crouching, crawling (Tr. 924), and requiring the need to avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity (Tr. 926).
●May 20, 2010, **Dr. James Gahman, M.D. state non-examining physician** reconsidered and affirmed the December 12, 2009 residual functional capacity opinion of Dr. McCloud, even in light of additional medical evidence that had been submitted  (Tr. 1115).

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

Plaintiff stated that he stopped working on July 12, 2009, because of back pain and the heavy lifting requirements of his job (Tr. 39).  He tried to return to work in early 2010, but was fired due to poor attendance related to his pain (Tr. 39).  Plaintiff also testified that he would refuse to have back surgery, even if his doctor indicated that he should, because he was afraid that he might lose his ability to walk independently (Tr. 40).  Plaintiff stated that he lived in a house with his cousin and spent his days at home doing virtually nothing (Tr. 50-55). He also testified that he did not leave the house unless he absolutely had to do so (Tr. 55). He noted that he would occasionally visit friends but, usually, it was they who came to visit him a couple of times per week (Tr. 55).  Plaintiff stated he went to the grocery store to buy bread and milk about twice a month (Tr. 56). Plaintiff spent about six to seven hours per day watching television (Tr. 58).

8

### 2.  Vocational Expert Testimony

The ALJ posed several hypothetical questions to the VE.

**Hypothetical No. 1**:  a hypothetical individual with Plaintiff's vocational characteristics who was limited to less than a full range of light work, that is, can lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and walk for about six hours and sit for about six hours in an eight hour work day with normal breaks, with no  climbing of ladders, ropes, or scaffolds; with occasional climbing of ramps or stairs, frequently balance with occasional other posturals like stooping, kneeling, crouching, or crawling; no concentrated exposure to extreme heat, cold, wetness, or humidity; and no use of hazardous machinery or exposure to unprotected heights (Tr. 70).  As to this hypothetical the VE answered that such a person would be capable of performing over one million light jobs, and over one million sedentary jobs, in the national economy, including **hand packager**, DOT 559.687-074, light and unskilled, SVP two, 2,800 jobs locally[5], 32,000 in the state and 500,000 nationally; **ticket seller**, DOT 211.467-030, light and unskilled, SVP of two, 7,00 jobs locally, 150,000 in the state and 3,400,000 nationally; **office cleaner**, DOT 323.687-014, light and unskilled, SVP of two, 2,400 jobs locally, 28, 000 in the state and 890,000 nationally; (Tr. 71);

**Hypothetical No. 2**:the hypothetical kept the light level of exertion, and added a sit/stand option that allowed the person to sit or stand alternatively, provided that the person was not off task more than 10 percent, limited to bilateral pushing and pulling to frequent, with the posturals the same as in Hypothetical No. 1, limiting the reaching with the right upper extremity to

---

[5]  The VE described the local area as Summit County, Ohio and the four surrounding counties  (Tr. 71).

frequent and in all directions, and limiting concentrated exposure to cold, heat, wetness or humidity, avoiding all use of moving hazardous machinery and unprotected heights, and the individual can understand, remember and carry out simple instructions and is able to make judgments on simple work related decisions, and is able to interact appropriately with supervisors and co-workers in a routine work setting, able to respond to usual work situations and changes in the work setting (Tr. 72). The VE responded that such an individual would be able to perform the job of the **ticket seller**, described above, as well as **office helper**, DOT 239.567-010, light and unskilled, SVP of two, 1,000 jobs locally, 3,000 in the state and 100,000 nationally; and **information clerk**, DOT 237.367-018, light and unskilled, SVP of two, 3,400 jobs locally, 36,000 in the state and 1,000,000 nationally; (Tr. 73). The ALJ's RFC determination essentially tracked the individual described in the ALJ's Hypothetical No. 2 (Hearing Decision of March 23, 2011, § 5, Tr. 14-15).[6]

---

[6]  The ALJ also posed a third hypothetical with additional restrictions and limitations ultimately not included in the ALJ's RFC determination. (See, ALJ Hearing Decision of March 23, 2011, § 5, Tr. 14-15). Even with these additional limitations, the VE determined that there was work that the Plaintiff could perform. **Hypothetical No. 3,** this hypothetical brought the individual down to sedentary work (i.e., lifting up to 10 pounds occasionally, sitting and walking for about two hours and sitting for six hours in an eight hour work day) and as well as the remaining limitations in Hypothetical No. 2 (Tr. 73-74). The VE responded that such an individual could perform the following jobs: **inspector**, e.g., eye glass framer, DOT 713.687-022, sedentary and unskilled, SVP of two, 3,500 jobs locally, 30,000 in the state and 671,000 nationally; **order clerk**, DOT 209.567014, sedentary and unskilled, SVP of two, 2,600 jobs locally, 9.000 in the state, 260,000 nationally, **assembler of electrical components**, DOT 789.687-010, sedentary and unskilled, DOT of two, 3,000 jobs locally, 10,000 in ths state and 200,000 nationally. (Tr. 75).

## IV. Analytical Overview: Determining Disability

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability." Colvin v. Barnhart, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)).   "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Colvin, supra,  (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

> **Step 1**: Determine whether the applicant is  engaged in "substantial gainful activity" at the time benefits are being sought.  If yes,  the applicant is not disabled. If no, then move to step 2.[7]
> **Step 2**: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe."  If there is no finding of a "severe" impairment, then there is no disability.  If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[8]

---

[7]  Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

[8]  Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to

**Step 3**: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments.  If yes, then the applicant is disabled.  If no, proceed to step 4.[9]

**Step 4**: Determine if the applicant retains sufficient "residual functional capacity"[10] to allow for the performance of his past, relevant work .  If the applicant possesses sufficient residual functional capacity to perform his past relevant work, then there is no disability.   If not, move to step 5. [11]

**Step 5**: Determine if there are jobs in the current economy that applicant could perform, given the limits of her residual functional capacity and consistent with the applicant's other relevant characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then the applicant is disabled.[12]

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

---

work. 20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[9]  The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  20 C.F.R §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926.

[10]  A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applicant's impairments, including those impairments that are not severe, must be considered. 20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[11]  Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[12]  The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience.  At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics.  20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c)    .

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982););  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),.  Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

### V. The ALJ's Findings

The ALJ made the following findings:

**1.**  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

**2.**  The claimant has not engaged in substantial gainful activity since July 12, 2009, the alleged onset date.

**3.**  The claimant has the following severe impairments:

    **a.**  Cervical disc disease with C3-4 spondylosis

    **b.**  Lumbar disc disease with L5-S1 radiculopathy

    **c.**  Thoracic spondylosis

    **d.**  Coronary artery disease

    **e.**  Uncontrolled diabetes mellitus, type II

    **f.**  Hyperlipidemia and pancreatitis with severe abdominal pain

    **g.**  Depression

    **h.**  Poorly controlled hypertension

**4.**  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

**5.**  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, he can lift and carry up to twenty pounds occasionally and ten pounds frequently but is limited to frequent pushing or pulling. He can frequently reach in all directions with the right upper extremity. He can stand and walk up to six hours and sit for up to six hours in an eight-hour workday with normal breaks. He requires a sit/stand option allowing him to sit or stand alternatively provided he is not off task more than 10% of the workday. He can never climb ladders, ropes or scaffolds but can occasionally climb ramps or stairs. He can frequently balance and occasionally stoop, kneel, crouch and crawl. He should avoid concentrated exposure to extreme heat, cold, wetness or humidity. He should avoid all use of hazardous machinery and exposure to unprotected heights. He can understand, remember and carry out simple instructions and make judgments on simple work related decisions. He is able to interact appropriately with co-workers and supervisors in a routine work setting and he can respond to usual work situations and changes to a routine work setting.

**6.**  The claimant is unable to perform any past relevant work.

**7.**  The claimant was born on November 8, 1965 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

**8.**  The claimant has at least a high school education and is able to communicate in English.
**9.**  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.
**10.**  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
**11.**  The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2009, through the date of this decision.

(Tr. 12-19, internal citations omitted).

## VI. Standard of Review

District Court review of Commissioner of Social Security disability determinations is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards.  Colvin v. Barnhart , supra, 475 F.3d at 729.  The district court shall affirm  the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  McClanahan v. Comm'r of Soc., 474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)).  The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. Id. (citing 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir.  1992)). See also Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

"The findings of the Commissioner are not subject to reversal merely because there exists

14

in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Moreover, because district court  review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from  making credibility determinations. Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)).  Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that such decision is supported by substantial evidence, even if the court were inclined to have decided the case differently.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999).  Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side.  Listenbee v. Sec'y of Health & Human Servs., 846 F.2d 345, 349 (6th Cir. 1988).  The decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion.  Smith v. Chater, 99 F.3d 780, 781-82 (6th Cir. 1996).

**VII.  Issues Before the Court**

This case raises three issues for review.

Whether the Administrative Law Judge Employed the Proper Legal Criteria and Whether Her Conclusions Lacked the Support of Substantial Evidence in Finding That Plaintiff Retains the Residual Functional Capacity to Perform a Range of Light, Unskilled Work, and Specifically:

**I.**  Whether the ALJ Erred in Failing to Obtain an Updated Medical Expert Opinion.

**II.**  Whether the ALJ Erred in Failing to Consider Properly Plaintiff's Obesity

15

Pursuant to SSR 02-1p.

**III.**  Whether the ALJ Erred in Failing to Consider Properly Plaintiff's Credibility and Pain Pursuant to SSR 96-7p.

## VIII.  Discussion

## I.  Whether The ALJ Erred in Failing to Obtain an Updated Medical Expert Opinion

Plaintiff argues that the ALJ erred in failing to call a medical expert to give testimony at the hearing of March 1, 2011, and in so failing, did not properly consider medical evidence that arose after December 12, 2009, (the date that state agency reviewing physician Dr. McCloud issued his opinion) as well as after May 20, 2010[13], (the date that state agency reviewing physician Dr. Gahman issued his opinion, essentially supporting the earlier opinion of Dr. McCloud).

The Plaintiff identifies the following new medical evidence that accrued subsequent to the issuance of the opinion by the state agency reviewing physician but prior to the hearing as: degenerative osteochondrosis (Tr. 1121, 1129) the administration of cervical injections (Tr. 1125-26); the onset and diagnosis of depression (Tr. 1135-36); a sixth hospitalization for acute pancreatitis arising from Plaintiff's persistent hypertriglyceridemia (Tr. 200-21, 1187-90); Plaintiff's lumbosacral pain management utilizing radiofrequency lesioning, after narcotic pain medication management and several rounds of facet injections had failed to provide lasting relief (Tr. 1155-66, 1168-69, 1171-73, 1175); treatment of Plaintiff's coronary artery disease, including a recent prescription for Holter monitoring (Tr. 1195).  (See Plaintiff's Brief, Docket No. 16, pp. 12-13).

---

[13]  Plaintiff erroneously refers to the date on which Dr. Gahman issued his report as May 10, 2010.  (Docket No. 16, p. 12).

16

The ALJ's decision of March 23, 2011, makes numerous references to instances of

medical evidence that occurred after December 12, 2009 and/or May 20, 2010.

- December, 2009, "claimant denied chest pain or shortness of breath. (13F at 9, 14F at 14)." (Tr. 16)
- January 7, 2010, "Dr. Barrett performed lumbar facet injections . . . (18F at 6, 11)" (Tr. 16).
- January 12, 2010, ". . . but the claimant complained of worsening pain . . . (18F at 6, 11)" (Tr. 16).
- January 21, 2010, "Dr. Barrett performed a second set lumbar facet injections . . . (19F at 3)" (Tr. 16).
- June, 2010, "An MRI . . . revealed degenerative osteochondrosis at C3-4 without critical central or neural foraminal stenosis and was 'otherwise unremarkable.' (21F at 6)" (Tr. 16).
- August, 5, 2010, "The claimant reported back pain to Dr. Barrett . . . with multiple complaints including back and right chest wall pain. (22F at 4) He was treated conservatively with medication, injections and stretching. (22F at 4, 9)" (Tr. 16).
- October, 2010, "He reported no chest pain . . ., even though he did not pick up his medication for hypertension. (28F at 6)"  (Tr. 16)
- December 3, 2010, "Radiofrequency lesioning of the left SI joint was performed . . . (26F at 2, 4)" (Tr. 16).
- January 7, 2011, " . . . Radiofrequency lesioning . . . was performed . . . on the right SI joint . . . (26F at 2, 4)," (Tr. 16).
- January, 2011, "The claimant denied muscle weakness, joint stiffness, instability or arthritis . . . (28F at 3)" (Tr. 16-17).
- January, 2011, "He complained of heart palpations, and was scheduled for a Holter monitor . . . (29F at 2)" (Tr. 17).
- June, 2010, " . . . the claimant was taking his medications as prescribed and his hypertension was controlled. (23F at 7, 9, 28F at 6)" (Tr. 17).
- December, 2009, " . . . radiographs showed another flare up of pancreatitis. (13F at 6-7)."  (Tr. 17).
- September, 2010, "The claimant was not treated for pancreatitis again until almost a year later . . .  He was not compliant with his diabetic or low fat diet and admitted eating chicken nuggets prior to the onset of symptoms. (1F at 2-4)  Jennifer Ney, D.O. did not recommend surgical intervention. (1F at 1-10)" (Tr. 17).
- July, 2010, "The claimant was diagnosed with depression and prescribed Zoloft by Dr Olympia . . . (23F at 3) Dr. Olympia noted an appropriate mood and affect, normal judgment and insight and no suicidal or homicidal ideation. (23F at 5) He denied mood or memory changes, anxiety or tension. (26F at 3)" (Tr. 17).
- June, 2009, " . . . the claimant's sugar levels were usually between160 and 200, and he had no hypoglycemic episodes. (8F at 16)" (Tr. 17)
- October, 2010, "He sought treatment from Wooster Endocrinology . . .. (24F) Treatment notes from that visit indicate the claimant was not taking his diabetic or blood pressure medications as recommended.  He was encouraged to comply with his treatment plan. (24F at 3, 8)" (Tr. 17).

17

Plaintiff argues that an ALJ "does not have the expertise to make medical judgments." Winning v. Comm'r. of Soc. Sec., 661 F.Supp.2d 807, 823 (N.D. Ohio 2009)  (Docket No. 16, p. 12).

In Winning the district court rejected the ALJ's determination of the claimant's mental condition.  Specifically, the Court rejected the ALJ's determination regarding the claimant's assertions of anxiety and depression, concluding that, while the ALJ had the authority to make credibility determinations, she did not possess the expertise to make a diagnosis of claimant's psychological condition, absent objective, supporting record evidence. Winning v. Comm'r. of Soc. Sec., 661 F.Supp.2d at 823-25. (finding that the ALJ had substituted her own unsupported, intuitive diagnosis of claimant's psychological condition for a diagnosis based on the expert opinion of appropriately trained health care professionals).  In the instant case, the Court does not find that the ALJ made a diagnosis as to any of Plaintiff's health conditions

Plaintiff's reliance on Winning is misplaced.  Winning and the cases cited therein that pertain to this issue, i.e.,  Bowman v. Astrue, No. 3:07CV478–J, 2008 WL 4386869, *3, 2008 U.S. Dist. LEXIS 73170, *7 (W.D. Ky. Sept. 23, 2008); Belden v. Heckler, 586 F.Supp. 628, 634–35 (N.D.Ind.1984); Wilder v. Chater, 64 F.3d 335, 337 (7th Cir.1995); Wiggins v. Apfel, 29 F.Supp.2d 486, 492–93 (N.D.Ill.1998) all stand for the proposition that an ALJ does not possess the expertise to make a medical or psychological diagnosis of a claimant's condition.   They do not stand for the proposition that record medical evidence that arises subsequent to the issuance of an opinion by a state agency reviewing physician must necessarily compel the ALJ to have such evidence reviewed by an additional state agency reviewing physician.

Plaintiff mischaracterizes the significance of the medical evidence that arose after the

dates that the state agency reviewing physicians issued their opinions.  As well, Plaintiff mischaracterizes the significance of the manner in which, and the purpose for which, the ALJ addressed this medical evidence.  Rather than being engaged in the process of making "medical judgments" the ALJ was merely engaged in the appropriate performance of her adjudicative responsibilities, that is she weighed the <u>whole</u> of Plaintiff's medical record - the record which arose prior to December 12, 2009, the record which arose from December 12, 2009 through May 20, 2010, and the record which arose after May 20, 2010 - along with the evaluations of the two state agency reviewing physicians to reach her RFC determination.  <u>See</u> <u>McGrew v. Comm'r of Soc. Sec.</u>, 343 F. App'x 26, 32 (6th Cir. 2009) (ALJ correctly relied on the opinion of a state agency physician which was issued prior to changes that occurred in claimant's condition, as well as medical evidence that arose after the issuance of the state agency physician's opinion in formulating an RFC determination).  <u>See also</u> <u>Foster v. Bowen</u>, 853 F.2d 483, 489 (6th Cir. 1988) (the relevant consideration in all disability cases is not a claimant's diagnoses, but the functional limitations caused by claimant's impairments).  Although making a functional capacity assessment pursuant to a review of a claimant's medical records may appear to resemble making a "medical judgment" the two are not identical.  In the instant case, the ALJ reviewed the whole of the medical record, including the record which accrued after the state agency physicians issued their opinions for the purpose of evaluating Plaintiff's RFC.

> The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician. See 20 C.F.R. §§ 404.1546(c), 416.946(c). Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Moreover, an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding. <u>See</u> <u>Ford v. Comm'r of Soc. Sec.</u>, 114 Fed.Appx. 194,

197 (6th Cir.2004).

Poe v. Comm'r of Soc. Sec., 342 F. App'x 149, 157 (6th Cir. 2009) (claimant argued that ALJ improperly based his RFC finding on his own interpretation of the medical evidence, the court held that ALJ was acting within his authority to reject a medical opinion of one of claimant's physicians)

Accordingly, based on the foregoing, this Court finds that the ALJ did not improperly include medical evidence that accrued since the issuance of the opinions by state agency reviewing physicians McCloud and Gahman in making her RFC determination and disability decision, did not make an independent medical or psychological diagnosis of Plaintiff's medical condition, did not err by not obtaining a third state agency review opinion as to medical evidence that arose after December 12, 2009 and/or May 20, 2010, and did base her RFC assessment and disability determination on substantial evidence.  Therefore, Plaintiffs claim for relief on this issue is denied.

## II.  Whether The ALJ Erred in Failing to Consider Properly Plaintiff's Obesity Pursuant to SSR 02-1p.

In his second claim of error the Plaintiff asserts that the ALJ failed to incorporate the consideration of Plaintiff's alleged obesity into her RFC and disability determinations.  Plaintiff argues that such failure was not harmless error and, as a consequence thereof, the ALJ's decision "failed to employ proper legal criteria and lacked the support of substantial evidence."  (Docket No. 16, p. 18).

Plaintiff notes that his "height and weight were documented repeatedly throughout the record, evidencing obesity." (Docket No. 16, p. 18).   In his Brief of the Merits, Plaintiff identifies record references to his height and weight and to his being overweight, specifically Tr.

20

474, 564-65, 631, 641, 947-48, 1133-34, 1137-38, 1098, 1112, 1159-66 (Docket No. 16, p. 18, fn 5, 6).

- Tr. 474, Dr. Olympia, Physician Order, January 6, 2009: Ht. 5'8", Wt. 206.7#
- Tr. 564-65, Dr. Olympia, Progress Notes, August 20, 2009, Ht. 68", Wt. 206, BMI 31-32
- Tr. 631, Dr. Pellegrino, Physical Exam, September 24, 2009, Ht. 5'8", Wt. 212#
- Tr. 641,  (This is a copy of Tr. 631)
- Tr. 947-48, (This is a copy of Tr. 564-65)
- Tr. 1133-34, Dr. Olympia, Progress Notes, August 6, 2010, Ht. 68", Wt. 214#, BMI 32.54
- Tr. 1137-38, Dr. Olympia, Progress Notes, June 10, 2009, Wt. 202#
- Tr. 1098, Dr. Barrett, Pain Letters / Progress Notes to Dr. Sandhu, November 11, 2009, section on Physical Examination "Physical exam reveals a 43-year male who is overweight . . ."
- Tr. 1112, (This is a copy of Tr. 1098)
- Tr, 1159-66, Dr. Barrett, Pain Letters / Progress Notes, November 10, 2010, section on Physical Examination "This is a 44-year-old man who is overweight . . ."

Plaintiff's medical record contains other references to Plaintiff's weight as well, e.g., Tr. 548 (Wt. 212 lb.) Tr. 549 (Wt. 202 lb.).

Plaintiff's medical records comprise just under one thousand pages of the approximately 1,200 page Transcript in this case, and despite the BMI numbers, noted above, and the statements from Dr. Barrett that Plaintiff is "overweight" there does not appear to be any explicit diagnosis of "obesity" in the medical records before this Court.[14]

In the instant case the Court is presented with several inter-related factual and procedural concerns.  First, Plaintiff's medical records do not contain a specific, express diagnosis by a qualified medical source that Plaintiff is obese.  Plaintiff's medical records only contain specific references to height and weight (as most medical records would be expected to do), as well as a

_____

[14]   This Court has perused Plaintiff's medical records but did not discover any specific record reference diagnosing Plaintiff as "obese."  Moreover, as obesity is, technically, a specific medical condition, it would seem that Plaintiff's argument is based upon an expectation that the ALJ should have diagnosed Plaintiff as obese.  There is some irony in this, considering that in Issue No. 1, Plaintiff argued that the ALJ does not possess the authority to make a medical diagnosis.

reference to Plaintiff being "overweight" and to Plaintiff's BMI.    Second, Plaintiff did not specifically plead obesity as a condition or impairment in his disability paperwork, nor did Plaintiff address the obesity issue  at the hearing.  (Tr. 26-77, 140, 184).  Third, in her hearing decision, the ALJ did not make any express reference to Plaintiff's weight, Plaintiff's BMI or that Plaintiff was either overweight or obese.

Accordingly, Plaintiff asks this Court to reject the ALJ's decision on the basis of a medical condition that was not specifically identified as such in the record and which condition Plaintiff himself hadn't argued in support of (until the current Brief on the Merits), merely because the ALJ did not explicitly discuss this condition in her decision.

Concerning the manner in which obesity is to be regarded in the context of a disability analysis, Social Security Ruling (hereinafter SSR) 02-1p provides, in relevant part, the following:

> The Clinical Guidelines recognize three levels of obesity. … Level I includes BMIs of 30.0 to 34.9. . . . [which] commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. . . .  Individuals with obesity may have problems with the ability to sustain a function over time . . .  The combined effects of obesity with other impairments may be greater than might be expected without obesity.

SSR 02-1p, internal citations omitted.

The requirement of SSR 02-1p is that obesity is to be factored into the overall disability analysis.

> Social Security Ruling 02-1p explains the Administration's policy on the evaluation of obesity. Although the Administration no longer qualifies obesity as a "listed impairment," the ruling "remind[s] adjudicators to consider its effects when evaluating disability." SSR 02-1p, 2000 WL 628049, at *1 (S.S.A.).

Coldiron v. Comm'r of Soc. Sec., 391 F. App'x 435, 442 (6th Cir. 2010) (unreported)

22

In Coldiron the Sixth Circuit has stated that it is a "mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants, "rather, it merely provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations."  Coldiron v. Comm'r of Soc. Sec., 391 Fed.Appx. at 443, quoting  Bledsoe v. Barnhart, 165 F.App'x 408, 412 (6th Cir. 2006).

Plaintiff appears to rely on Norman v. Astrue, 694 F.Supp.2d 738 (N.D. Ohio 2010) for the argument that because Plaintiff's medical records include height and weight references, as well as BMI references, and a reference to Plaintiff being overweight,  that the ALJ was obligated to have incorporated and expressly referred to obesity in her RFC and disability analysis.  "Herein, the ALJ did not mention Plaintiff's obesity." (Docket No. 16, p. 18).

Norman states the following  "Considering the specific reference in the ruling to the combined effect of obesity on musculoskeletal impairments, it was incumbent upon the ALJ to specifically address Norman's obesity and its contributing impact."  Norman v. Astrue, 694 F.Supp.2d at 749.  (Docket No. 16, p. 18).  The court continued:

> Yet, the ALJ must still "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." Nejat v. Comm'r of Soc. Sec., 359 Fed.Appx. 574, 577, 2009 WL 4981686, at *3, 2009 U.S.App. LEXIS 28206, at *8 (6th Cir. Tenn. Dec. 22, 2009) (citing Bledsoe, 165 Fed.Appx. at 411–12). Put simply, this is more than a requirement that the ALJ mention the fact of obesity in passing: "courts ... remand[ ] even for a mere failure to consider obesity." Macaulay v. Astrue, 262 F.R.D. 381, 390 (D. Vt.2009) (citations omitted); see also Johnson v. Astrue, Case No. 08–3658, 2010 WL 148411, at *18, 2010 U.S. Dist. LEXIS 2100, at *58 (S.D. Tex. Jan. 11, 2010) ("[T]he ALJ should develop the record on the issue of [the claimant's] obesity and how her obesity impacted her ability to function and work ...."); Priestley v. Astrue, Case No. 6:08–546, 2009 WL 1457152, at *14, 2009 U.S. Dist. LEXIS 109860, at *6 (D.S.C.2009) ("[T]he ALJ merely claimed he considered Plaintiff's obesity in determining his assessment. He failed to provide any explanation as to how this severe impairment factored into his assessment. Given this utter lack of explanation, the Government was not substantially justified in taking the position

23

that the ALJ properly executed his duties with regard to assessing Plaintiff's obesity.").

Norman v. Astrue, 694 F. Supp. 2d at 741-42.

Arguing to the contrary, Defendant notes that SSR 02-01p does not require a particular mode of analysis regarding the manner in which the ALJ is to consider a claimant's obesity. (Docket No. 17, p. 14).  See, Nejat, supra, 359 F. App'x. at 577.   However, Defendant asserts that "[i]n this case, Plaintiff never alleged obesity as a disabling impairment in his disability paperwork or at his administrative hearing (Tr. 26-77, 140, 184)" (Docket No. 17, p. 14). Defendant rejects Plaintiff's reasoning that if the ALJ had considered Plaintiff's obesity and its affect on his severe impairments, she would likely have found Plaintiff's disability claims meritorious.  Id.  Accordingly, Defendant asserts that such speculation is not a basis for disrupting the ALJ's decision.  See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

Defendant relies on an opinion issued by the Seventh Circuit, Skarbek v. Barnhart, 390 F.3d 500 (7th Cir. 2004)[15], for the proposition that despite not having expressly articulated any reference to Plaintiff's weight in her decision, the ALJ had factored it into her decision "indirectly . . . as part of the doctors' reports."  (Docket No. 17, p. 14).  "Although Skarbek did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. . . . Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."  Skarbek, 390

_____

[15]   Defendant erroneously cites this case as Skarbek v. Barnhart, 390 F. 2d 500, 504 (7th Cir. 2004)

F.3d at 504.

The Sixth Circuit has referred to <u>Skarbek</u> in addressing the necessity for the ALJ to have

addressed a claimant's obesity in its decision

> [T]he ALJ does not need to make specific mention of obesity if he credits an
> expert's report that considers obesity. <u>See</u>, <u>e.g.</u>, <u>Skarbek v. Barnhart</u>, 390 F.3d
> 500, 504 (7th Cir.2004) (stating "although the ALJ did not explicitly consider
> [claimant's] obesity, it was factored indirectly into the ALJ's decision as a part of
> the doctors' opinions."). Drs. Long and Hughes considered Bledsoe's obesity. JA
> 270 (note, in the caption, "alleged impairment: obesity"). Thus, the ALJ's opinion
> shows that he considered Bledsoe's obesity.

<u>Bledsoe v. Barnhart</u>, 165 F. App'x at 412.

However, in the instant case, neither Dr. McCloud's RFC assessment, December 12,

2009, (Tr. 922-29) nor Dr. Gahman's RFC assessment, May 20, 2010, (Tr. 1115),  make

reference to Plaintiff's height, weight, BMI or to the record statements that Plaintiff is

overweight or to obesity.  Thus, in the instant case, the ALJ cannot be found to have made even

the attenuated, vicarious or constructive reference to the obesity issue, by relying on such a

reference in the reports of the expert, state agency reviewing physicians, as discussed in <u>Bledsoe</u>,

<u>supra</u>.

Finally, as discussed above, as far as this Court has been able to ascertain, Plaintiff's

medical records - despite including various descriptive references to Plaintiff's height and

weight, and a few references to Plaintiff's BMI and an occasional remark that Plaintiff was

overweight - do not contain an express articulation of Plaintiff's obesity.  Yet, Defendants appear

to have conceded to, if not ratified, Plaintiff's "diagnosis" that Plaintiff is obese wherein

Defendant states, "[i]n this case, the ALJ considered all of the reports from Plaintiff's treatment

providers, who were aware of Plaintiff's obesity."  (Docket No. 17, p. 14).

25

This being so, and for the reasons, stated, above, this Court finds that the ALJ did not account for Plaintiff's obesity in her RFC and disability determinations as required under SSR 02-1p and finds the claim of error raised in Plaintiff's Issue No. 2 well taken.  Therefore, in accordance with the requirements of SSR 02-1p and the interpreting line of cases, i.e., Coldiron, Bledsoe, Norman, et al., this Court orders that this case be remanded to the Commissioner for the purpose of considering, evaluating and expressly articulating the effects, if any, of Plaintiff's obesity on Plaintiff's RFC and disability.

**III.  Whether The ALJ Erred in Failing to Consider Properly Plaintiff's Credibility and Pain Pursuant to SSR 96-7p.**

In his third claim of error the Plaintiff asserts that the ALJ failed to assess properly Plaintiff's credibility and pain.  Plaintiff argues that the ALJ's analysis of Plaintiff's credibility and pain were not supported by substantial evidence and did not conform to the required legal criteria for making such assessments.  (Docket No. 16, p. 16).

Plaintiff points to SSR 96-7p, which sets forth the Administration's policy regarding the factors that an adjudicator shall address when assessing a claimant's symptoms, such as pain. SSR 96-7p states, in part:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability . . .  [T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence. . . .  In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the

individual's statements.

SSR 96-7p (internal citations omitted)

SSR96-7p also provides guidance for evaluating a claimant's pain and credibility by indicating that examples of regular and persistent effort to obtain relief, increase in medication usage, pursuit of alternative treatment modalities, history of ongoing effort to find satisfactory treatment, e.g., seeking referrals to specialists, changing treatment sources, etc., are indicators that support an individual's claims concerning pain or other subjectively reported symptoms.  Id.

The Social Security regulations establish a two-step process for evaluating pain. 20 CFR section 404.1529, Social Security Ruling (SSR) 96-7p.  This process can be summarized as follows:

1. Determine whether there is objective medical evidence for the claimants allegation of pain.  If there is no such objective basis, the analysis need not proceed.  However, if there is an objective basis for a claimant's reports of pain, then the assessment must proceed to the next stage which requires, either

    a.  determining whether the (previously identified) objective medical evidence confirms the severity of the pain alleged to have arisen therefrom, or

    b.  determining whether the (previously identified) objective medical evidence is sufficiently severe that it is reasonable to conclude that it caused the pain described by the claimant.

See Duncan v. Secretary of Heath and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

In addition to undertaking an examination of the objective medical evidence of a claimant's allegation of pain, the ALJ is also required to assess a claimant's reports of pain utilizing the following six. criteria:

1.  The effect of the pain on the claimant's daily activities.

2.  The bodily location, amount of time experienced, frequency of occurrence and description of the intensity of the pain.

3.  Factors that precipitate or aggravate the manifestation of pain.

4.  The use of pain relief medications, including the type, dosage regimen, effectiveness and side effects of such pain relief therapies and medications.

5.  The use of non-medication pain relief therapies, including the type, usage regimen, effectiveness and side effects of such pain relief therapies and medications.

6.  The opinions and statements of claimant's doctors.

See Felisky v. Bowen, 35 F.3d 1027, 1038-40 (6th Cir. 1994).

Therefore, the ALJ shall first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the claimant's pain and, second, after identifying the underlying, objectively determinable cause, assess the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. See Duncan and Felisky, supra.  Additionally the ALJ shall assess the claimant's credibility and consider, inter alia, the claimant's statements about pain, its location, duration, frequency, etc., and other symptoms, along with the rest of the relevant evidence in the record, in accordance with the factors outlined in Social Security Ruling 96-7p. See SSR 96-7p. Felisky, 35 F.3d at 1039-40.

> An ALJ in a unified statement should express whether he or she accepts the claimant's allegations as credible and, if not, explain the finding in terms of the factors set forth in the regulation [20 CFR 404.1629(c), 416.929(c)]. The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence. The articulation should not be conclusory; it should be specific enough to permit the court to trace the path of the ALJ's reasoning.

Cross v. Comm'r of Soc. Sec., 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

Plaintiff argues that the ALJ's credibility determination of Plaintiff was unsatisfactory stating that the ALJ cited to erroneous and inappropriate facts (e.g., Plaintiff argues that the

ALJ's characterization of Plaintiff's treatment for his back condition as "conservative" was misleading, and that a correct assessment was that the treatment began as conservative but "escalated" to include medication, narcotics, physical therapy, injections and, finally, radiofrequency lesioning (Docket No. 16, p. 15, Tr. 1155-66, 1168-69, 1171-73, 1175).). Plaintiff also asserts that his reluctance to undergo back surgery cannot be factored against his credibility (as the ALJ did in making her assessment of Plaintiff (Tr. 17)), because his decision to forego surgery represented a rational assessment of both the potential of surgery to resolve successfully his back problems balanced against his reasonable concern for the possibility of an adverse outcome.  (Docket No. 16, p. 15, Docket No. 18, p. 2-3).  Plaintiff also argues that the ALJ did not assess correctly his not needing ambulatory aids, his chest pain (which manifest periodically, and was attributed to differing etiologies) and his recurrent pancreatitis.  (Docket No. 16, pp. 15-16).

The ALJ's characterization of Plaintiff's rationale for refraining from undergoing back surgery, i.e., "The claimant testified that he is not willing to seek surgical correction of his back impairment . . ."  (Tr. 17) does significantly misstate Plaintiff's explanation on this matter.  As Plaintiff testified at his hearing in response to the ALJ's query about his back condition:

> I told him I don't want to do surgery if I don't have to. It's scar[y], my uncle had back surgery on his lower back and now he can't, you know, he walks with a walker and he's 62 years old. And I don't want that to happen as long as I can walk to get around to do what I need to do, then I would rather not. But if it gets to the point where I have to have the surgery, then I will have it done.

(Tr. 40).  Whether or not this statement reflects on Plaintiff's credibility, it certainly is not, as the ALJ characterized it, an unambiguous assertion that Plaintiff was unwilling to undergo surgery. To the contrary, Plaintiff's statement sets forth a reasonable and balanced acknowledgment of

both the benefits and pitfalls of surgery and the shadow of uncertainty that encompasses  both possible outcomes.

Notwithstanding the foregoing, however, a review of the ALJ's narrative summary (Tr. 15-18) explaining her RFC determination, does support the finding that the ALJ's credibility and pain determinations were supported by substantial evidence and conformed to the legal criteria set forth in SSR 96-7p.

The ALJ noted that she considered all Plaintiff's symptoms in light of the objective medical record (Tr. 15).  She acknowledged that his medically determinable impairments could reasonably be expected to have caused his alleged symptoms but that Plaintiff's statements regarding intensity, persistence and limiting effects of his symptoms were not credible as they were inconsistent with the ALJ's RFC determination.  Id.  Concerning Plaintiff's statements regarding chest pain, the ALJ noted that Plaintiff had not complained of persistent pain since his surgery (Tr. 16).  She also noted that since his bypass surgery and the subsequent MRSA infection, which was treated with antibiotics, Plaintiff was cleared to return to work by his cardiologist, Dr. Malosky, on March 25, 2008, and that his incision from the surgery was determined to have healed well, and Plaintiff denied post-operative chest pain (Tr. 16, 223, 239-40, 261, 303-304, 375-89, 628)

Additionally, regarding Plaintiff's complaints of chest pain the ALJ noted that Plaintiff's physician, Dr. Olympia, observed that x-rays showed that Plaintiff's cardiac, hilar and mediastinal structures appeared unremarkable and that in June and July of 2009, the doctor noted that Plaintiff's heart was fine.  (Tr. 16, 394, 558-61).

Concerning Plaintiff's claims of lower back pain, the ALJ stated that x-rays revealed

mild mid-lumbar spondylosis, and mild to moderate thoracic spondylosis, vertebral bodies were normal in height and alignment, an October, 2009 MRI showed slight to moderate central spinal canal and neural foraminal stenosis, and mild diffuse spondylosis that included mild facet joint arthropathy at L5-S1, and that an EMG study showed mild lower extremity polyneuropathy, likely the result of diabetes (Tr. 16, 395-96, 562-63, 566-67, 577, 943, 1085, 1087). Additionally, regarding Plaintiff's back pain, the ALJ noted that Plaintiff's physician had prescribed physical therapy, but Plaintiff had discontinued it because he claimed it made him feel worse and that he had attended only the initial evaluation session and did not return for any remaining appointments.  (Tr. 16, 655, 664).

The ALJ stated that after Plaintiff began seeing Dr. Barrett that, despite complaints of ongoing back and chest pain, his chest wall films showed no gross abnormalities and that in December of 2009, Plaintiff denied chest pain as well as shortness of breath (Tr. 16, 938, 968, 1098-99).

The ALJ observed that Dr. Barrett had noted that previous injections had provided Plaintiff with temporary relief and that radiofrequency lesioning of the SI joints would be an appropriate next step, and that such procedures were performed on December 3, 2010 and January 7, 2011, and that Plaintiff denied muscle weakness, joint stiffness, instability or arthritis in January of 2011 (Tr. 16-17, 1155-1157, 1159).

Other factors noted by the ALJ in evaluating Plaintiff's condition included that in January, 2009, after being discharged from the hospital subsequent to a pancreatitis flare up Plaintiff was prescribed medication and instructed to follow a special diet (Tr. 17, 454-55) and that in May, 2009, Plaintiff had a pancreatitis flare up due to eating a hamburger (Tr. 17, 317,

321), and that he had a subsequent flare up in September, 2010, due to not being compliant with his diabetic and low fat diets and because he had eaten chicken nuggets (Tr. 17, 200-208).

The ALJ acknowledged that Plaintiff's long work history enhanced a positive credibility determination but that the medical record, taken as a whole, did not support Plaintiff's claim that he was unable to perform other jobs at a lighter exertional level than his previous employment.

Accordingly, a close review of the record indicates that, despite the ALJ's erroneous characterization of Plaintiff's reasons for refraining from having back surgery, there was other substantial evidence to support her credibility determination.  Therefore, this Court denies Plaintiff's third claim for relief and finds that the ALJ's credibility and pain assessments were based on substantial evidence and conformed to applicable law.

## IX.  Conclusion

For the reasons discussed above, the Magistrate affirms the Commissioner's Decision as to the matters raised in Plaintiff's Issues No. 1 and 3 but reverses and remands this case,  for further proceedings consistent with the findings set forth above, regarding the matters raised in Plaintiff's Issue No. 2, concerning the Plaintiff obesity.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   June 21, 2012

32